# UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
## GREENSBORO DIVISION

| | | |
|---|---|---|
| In Re: | ) | |
| | ) | |
| TURNKEY PRODUCTS, LLC, | ) | CASE NO. 15- |
| | ) | |
| Debtor. | ) | |

## EMERGENCY MOTION TO INCUR DEBT CONTINUING WITH THE CURRENT FACTORING AGREEMENT AND INVENTORY LINE OF CREDIT AND FOR AUTHORITY TO USE CASH COLLATERAL

NOW COMES the above captioned Debtor in Possession requesting emergency authority to incur debt and to use cash collateral pursuant to 11 U.S.C. § 364 and other applicable sections of Title 11 of the U.S. Code in order to allow the Debtor in Possession to continue its day to day operations and, in support thereof, shows unto the Court the following:

1.      The above captioned Debtor filed a voluntary petition under Title 11, Chapter 11 of the United States Bankruptcy Code on February 27, 2014 ("Petition Date").  Since the filing the Debtor has operated as a Debtor in Possession.

2.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, 11 U.S.C. §§ 105, 361, 363, 364, 1107 and 1108.

3.      This is a core proceeding pursuant to 28 U.S.C. § 157.

4.      Turnkey has been in business since 1998, designing and importing home office furniture from China and Viet Nam. Turnkey sells its products to furniture retailers across the United States through multi-lined, independently contracted salespeople or sales groups (collectively "Salespeople"). Shipments of products are made directly to retailers from Turnkeys' Asia source factories via full direct container shipments. Additionally, Turnkey warehouses finished goods at Zenith Global Logistics located in Conover, NC, Riverside, CA, and Indianapolis, IN. These inventories are purchased by retailers purchasing less than container load

shipments. Turnkey maintains two trade only showrooms in High Point, NC and in Las Vegas, NV. Turnkeys assets consist of inventory and accounts receivable.

5.     The Debtor pre-petition entered into a factoring agreement and line of credit secured by inventory with Capital Business Credit, LLC (hereinafter "CBC"). The terms of the factoring agreement allowed for qualified accounts receivable to be assigned to CBC who in turn agreed to pay Turnkey an initial amount of 84.5% of the account receivable balance. Qualified account receivables are accounts which have been pre credit approved or qualified. If the account receivable assigned is pre-qualified, CBC agreed that it was responsible for the collection of the accounts receivable and there was no right of recourse against Turnkey. To the extent that CBC financed and assigned receivables that are not a pre-credit approved contract then CBC did not assume the credit risk associated with the receivable. Upon collection of an assigned receivable an additional 14% of the original invoice amount is paid to Turnkey. The remaining portion (1.5%) of the collected receivable is retained by CBC. At the time of filing, upon information and belief, all assigned accounts receivables to CBC were pre-qualified and therefore, the assumption of risk for the collection of the same remains with CBC.

6.     In addition to the factoring agreement CBC extended a line of credit secured on inventory. The basic terms of the line of credit were that they would lend up to $200,000.00 based upon 50% of the value of eligible inventory. Debtor is required to pay interest on any outstanding use of credit line on a monthly basis. At the time of filing, the credit line was maxed out at $200,000.00. The inventory value supporting the same is approximately $465,000.00.

7.     CBC has agreed to continue factoring accounts receivable and the line of credit agreement with Turnkey, post-petition, upon substantially the same terms and conditions as existed pre-petition. As of the filing of the Chapter 11 the Debtor is not aware of any breaches to credit facilities.  Attached hereto and incorporated herein by reference is a copy of the pre-petition Capital Business Credit LLC factoring agreement and the security agreement supplement/inventory as it would relate to the inventory line of credit. It is anticipated that the Debtor and CBC will enter into additional documentation to evidence post-petition financing, if approved by the Court. Said documents are being drafted and are not available at the time of filing, but should closely track all material terms and conditions as contained in the documents attached hereto.

8.     At this time the Debtor does not have in place any credit facility other than the CBC facility, which would allow for them to borrow funds for the purposes of operations thereby requiring them to use the cash generated from pre-petition and post-petition operations which would include the use of pre-petition collateral to pay all expenses incurred in the ordinary course of business. It is the Debtors position that cash on hand is not covered by an applicable security interest but any cash generated from the sale of inventory may be cash collateral as that term is defined in 11 U.S.C. § 363(a) and as a result the Debtor is restricted from using the same without consent of the secured creditor CBC. Furthermore, if the Debtor, post-petition, is to continue assigning its accounts receivable and operating pursuant to the terms and conditions of the pre-petition factoring arrangement and credit line the same cannot be done pursuant to 11 U.S.C.  § 364 without establishing that the Debtor is unable to obtain unsecured credit, and after notice and hearing, is authorized to obtain credit by the Court pursuant to 11 U.S.C.  § 364(c).

9.     The Debtor is therefore in need to use cash collateral and to incur indebtedness which would include continued assignments of qualified account receivables generated post-petition. As previously indicated, cash collateral will be generated from the sale of pre-petition inventory. If this authority is not granted to allow the limited use of cash collateral and obtain the authority to incur post-petition indebtedness to operate the Debtors business post-petition in the ordinary course of business it will result in a detrimental impact on the continued viability of the business, interfere with the prospects of reorganization, and cause immediate and irreparable damage to the going concern value of Debtor. Failure to grant the relief requested, in all likelihood, will result in the Debtor being unable to operate and therefore be placed in a position to sell assets by means of forced liquidation. The forced liquidation of the assets of this company will be adverse to the interest of CBC, unsecured creditors, and all other creditors and parties in interest in this proceeding, including employees of the Debtor.

10.     The relief requested herein will be necessary to allow the Debtor to pay its operational needs which includes the costs of maintaining its property, providing funds for the payment of wages and commissions, purchasing of additional inventory, rents for showrooms and/or marketing expenses, and other expenses incurred in the ordinary course of the Debtors business and as a result of the filing of the Chapter 11 proceeding. It has been previously indicated that the Debtor has been unable to obtain sufficient unsecured post-petition financing that would allow it to continue operating and maintain the viability of this Debtor. However, the Debtor does have the ability to continue pre-petition financing with CBC so as to allow for the Debtor to continue operating in the ordinary course of business post-petition and to maintain its business as a viable operation and to place it in a position to restructure its financial affairs, and

to file a feasible plan of reorganization which can be confirmed by the Court to the benefit of all creditors herein.

11. CBC is the only party which the Debtor believes has a lien on inventory that would create cash collateral and is the only party who is agreeing to provide post-petition financing, and as such said party can be adequately protected as a result of the following:

a. To the extent the Debtors business incurs additional financing through the creation and assignment of accounts receivables then the terms and conditions in the pre-petition factoring agreement provides for the adequate protection of the interest of CBC and does not create prejudice of the rights of other creditors herein. The Debtor does not intend to factor any unqualified accounts receivable post-petition without further court order. As a result, the credit risk for all factored accounts receivable post-petition will remain with CBC.

b. Pursuant to 11 U.S.C. § 361, 363(c), 364(d)(1), CBC shall be granted a post-petition security interest and lien of the same validity, extent and priority as CBC's pre-petition collateral in (i) all of the Debtors Pre-Petition Collateral and proceeds thereof (hereinafter "Pre-Petition Collateral") and (ii) any collateral or proceeds hereof acquired post-petition (hereinafter "Post-Petition Collateral") and; (iii) all Post-Petition Collateral together with Pre-Petition Collateral shall herein be referred to as "Collateral". The liens and security interest granted to CBC hereunder shall be limited in the amount to the sum of the aggregate diminution subsequent to the petition date and the value of the interest of CBC in Pre-Petition Collateral resulting in any utilization or consumption of Pre-Petition Collateral and inadequate replacement of the same by Post-Petition Collateral. Subject to the foregoing the security interest and liens granted herein shall be valid, perfected, and enforceable security interest and liens on said

property of the Debtors estate without further filing or the recording of any documents or instruments or other action and shall the same validity and perfection as said liens had pre-petition. The Collateral, as defined herein does not include a lien on any proceeds created by avoidance actions or lien on any avoidance action of the Debtor as such avoidance action may exist for the benefit of the estate pursuant to 11 U.S.C. §§ 510, 542. 543. 544, 545, 547, 548. 549, 550, 553 or 724(a). Furthermore, the Collateral as defined herein would not include a lien on any of petition retainer to professional or on any funds distributed to professional in accordance with the budget as approved by the Court.

c.     The operations of the Debtor and its use of cash collateral shall be authorized as long as the Debtor maintains the inventory level counting both pre-petition and post-petition inventory at a level equal to the required 50% of eligible inventory relative to outstanding loan. At this time the outstanding loan is $200,000.00 therefore inventory must be maintained at or greater than $400,000.00.

12.     It is in the best interest of the Debtor, the secured creditor, unsecured creditors and all other parties in interest for this Debtor to be authorized to immediately use cash collateral and incur post-petition financing, upon the terms and conditions, and for the purposes stated herein. The entry of such order should be allowed on an emergency basis with a preliminary hearing on the same and with a notice of final use of cash collateral and authority to enter into Post-Petition financing pursuant to Rules of Bankruptcy including Rule 4001(b). The immediate hearings concerning the relief sought herein should be allowed on a shortened notice as is necessary and indicated herein to allow the Debtor to maintain its viability pending further rulings on issues related to relief requested. The benefits gains for the relief requested herein

have a value in excess of the deterioration of the value of this Debtor if this relief is not granted immediately. The relief granted is for the benefit of all creditors and parties in interest.

WHEREFORE, the Debtor respectfully request:

1.     An emergency hearing to allow for the emergency use of cash collateral and incurring of post-petition indebtedness; and

2.     Notice of hearing on the preliminary hearing for the use of cash collateral and the authority to incur post-petition indebtedness; and

3.     Shortened Notice of hearing and with further notice of the final hearing to be set on this matter pursuant to Notices required by Bankruptcy Rules including Rule 4001; and

4.     To the extent necessary authorize the use of cash collateral and adequate protection for the interest of the secured creditor as outlined herein; and

5.     For such other and future relief as to the Court deems just and proper.

This the 17$^{h}$ day of April, 2015.

/s/ Charles M. Ivey, III
Charles M. Ivey, III
Attorney for Debtor
NCSB# 8333

OF COUNSEL:
Ivey, McClellan, Gatton & Talcott
Post Office Box 3324
Greensboro, North Carolina 27402

## CAPITAL BUSINESS CREDIT LLC
## FACTORING AGREEMENT

Date: 1|6|2014

From:    TURNKEY PRODUCTS, LLC
723 S. Casino Center Blvd., 2nd Floor
Las Vegas, NV 89101

To:    CAPITAL BUSINESS CREDIT LLC
11121 Carmel Commons Blvd., Suite 270
Charlotte, North Carolina 28226

Gentlemen:

Upon your written acceptance, to be noted at the foot of this Agreement, the following will state the terms and conditions under which you are to act as our sole factor:

    1.  APPOINTMENT AND SALE OF ACCOUNTS:  We hereby appoint you our sole factor, and hereby sell and assign to you, making you absolute owner thereof, all of our accounts, contract rights, notes, bills, acceptances and all other obligations to us (hereinafter referred to as "Receivables") for the payment of money, in cash or in kind, together with all proceeds thereof, all security and guarantees therefor, and all of our rights to the goods and property represented thereby.  You shall have all the rights of an unpaid seller or provider of the goods or services, the sale or rendering of which gives rise to each Receivable, including the rights of stoppage in transit, reclamation and replevin.  Upon each sale of goods or rendering of services, we shall execute and deliver to you such confirmatory assignments of our Receivables as you may require, in form and manner satisfactory to you, together with copies of invoices, all shipping or delivery receipts, and such other proof of sale and delivery or performance as you may, at any time or from time to time, require to effect collection of our Receivables.  We shall make appropriate notations upon our books and records indicating the sale and assignment of our Receivables to you.  All invoices or other statements to our customers concerning Receivables shall clearly state, in language satisfactory to you, that each such Receivable has been sold and assigned to you and is payable to you and to you only.  Copies of Receivables sold and assigned to you shall also bear this language.  During the term of this Agreement, we agree not to sell, negotiate, pledge, assign or grant any security interest in any or all of our Receivables to anyone other than you.  If we are or become engaged in finishing or improving goods, we agree, notwithstanding any credit approval you may have given on the customer(s) involved, to assert promptly, at our expense and upon your demand, any lien rights provided by law on goods in our possession.  We will remit to you the proceeds of sale of such goods to satisfy the amounts owed to you by the owner of the goods.  It is understood that your credit approval is limited to the net amount of the customer's obligation after the sale and disposition of such goods.

    2.  CREDIT RISK:  You will assume the credit risk only on Receivables for which you have given credit approval in writing ("Credit Approvals").  In the absence of such written Credit Approval from you, the Receivable is at our risk. If we ship merchandise or provide services based on a verbal approval, we acknowledge our responsibility to ensure that such approval is received by us in writing in a timely manner.  We acknowledge that Credit Approvals may be withdrawn, ~~either orally or~~ in writing, in your discretion at any time if, in your opinion, a customer's credit standing becomes impaired before actual delivery of merchandise or rendering of services.  In addition, all Credit Approvals relating to our sales to Debtors in Possession or other of our customers which have been identified by you to us in writing as being special situation accounts or on which we have agreed to pay an additional commission, shall be

automatically cancelled (whether or not the merchandise has been delivered or services rendered) immediately upon receipt by you of a notice from us (either oral or in writing) indicating our intention to terminate this Agreement. Credit Approvals shall be limited to the specific terms and amounts indicated, and, notwithstanding any information subsequently provided to us by you, such credit approvals are automatically rescinded and withdrawn if the terms of sale vary from the terms approved by you, or if the terms of sale are changed by us without your written Credit Approval on the new terms, or if the Receivable is not assigned to you promptly (within five days) after creation. We further acknowledge that if we ship merchandise or provide services to a customer who has outstanding Receivables from us, and such customer's credit line and/or outstanding Credit Approvals have been withdrawn by you, and the Receivables created thereby, whether or not they are sold and assigned to you, exceed ten percent (10%) of the amount outstanding on your books, that any credit approvals applying to those Receivables outstanding on your books are canceled and all outstanding Receivables from that customer are at our risk. If a customer, after receiving and accepting delivery of goods or services (subject to all warranties herein) for which you have given written Credit Approval, fails to pay a Receivable when due, solely to financial inability to pay, you shall bear any loss thereon. If nonpayment is due to any other reason, however, you shall not be responsible. Specifically, you shall not be responsible for any nonpayment of a Receivable: (a) because of the assertion of any claim or dispute by a customer for any reason whatsoever, including, without limitation, disputes as to price, terms of sale, delivery, quantity, quality, or other, or the exercise of any counterclaim or offset (whether or not such claim, counterclaim or offset relates to the specific Receivable); (b) where nonpayment is a consequence of enemy attack, civil commotion, strikes, lockouts, the act or restraint of public authorities, acts of God or force majeure; or (c) if any representation or warranty made by us to you in respect of such Receivable has been breached. The assertion of a dispute by a customer shall have the effect of negating any Credit Approval on the affected Receivable(s) and such Receivable(s) shall be at our risk until paid or otherwise cleared from your books. With regard to sales without Credit Approval or in excess of any Credit Approval as to any given customer, we agree that any payments or credits applying to any Receivables owing by such customer will be applied: first, to any Credit-Approved Receivables outstanding on your books; second, to any Client Risk Receivables outstanding on your books; and, third, to any Receivables outstanding on our books. This order of payment applies regardless of the respective dates the sales occurred and regardless of any notations on payment items. If you fail to collect a Receivable for which you have given Credit Approval within 120 days of its maturity, and your failure to collect such Receivable is due solely to the customer's financial inability to pay, you shall pay to us the net amount of such Receivable then owing on the Wednesday next following the week during which said 120 days expired. Any Receivable for freight, samples, or miscellaneous sales (including, without limitation, the sale of merchandise and/or in quantities not regularly sold by us) is always assigned to you at our risk, notwithstanding any written credit approval from you. You shall have no liability of any kind for declining or refusing to give, or for withdrawing, revoking, or modifying, any Credit Approval pursuant to the terms of this Agreement, or for exercising or failing to exercise any rights or remedies you may have under this Agreement or otherwise. In the event you decline to give your Credit Approval on any order received by us from a customer, and in advising us of such decline you furnish us with information as to the credit standing of the customer, such information shall be deemed to have been requested of you by us and your advice containing such information is recognized as a privileged communication. We agree that such information shall not be given to our customer or to our salesman. If necessary, we shall merely advise our customer that credit has been declined on the account and that any questions should be directed to you. In addition, all Credit Approvals relating to our sales to Debtors in Possession or other of our customers which have been identified by you to us in writing as being special situation accounts or on which we have agreed to pay an additional commission, shall be automatically cancelled (whether or not the merchandise has been delivered or services rendered) immediately upon receipt by you of a notice from us (either oral or in writing) indicating our intention to terminate this Agreement.

3. CLIENT RISK RECEIVABLES: Any sale of goods or rendering of services by us for which we have not received written Credit Approval, or for which Credit Approval has been withdrawn or revoked, shall be known as a "Client Risk Receivable." Any Client Risk Receivable(s) assigned to and purchased by you are with recourse to us and at our sole credit risk. You shall have the right to charge back to our account the amount of such Client Risk Receivable(s) at any time and from time to time, either before or after maturity. We agree to pay you on demand the full amount thereof, and, failing to do so, we agree to pay all expenses incurred by you up to the date of such payment in attempting to collect or enforce payment of such Receivable(s). For purposes of determining your credit risk hereunder, the Receivable balance due you from any given customer shall be calculated as the aggregate amount owed by that customer less any credits to which such customer may be entitled, and is not to be construed to mean individual invoices owed by that customer. In the event that any claim is ever made upon you for the repayment or recovery of any amount received by you in payment of a Client Risk Receivable by the payor or legal representative thereof (including a trustee in bankruptcy) under the Bankruptcy Code or any other federal or state insolvency law, then we shall pay you on demand the amount of such Client Risk Receivable subject to such repayment. Alternatively, you in your sole discretion may charge such amount against our account with you. If such claim for repayment is asserted against you, you will give us notice thereof and we may, at our expense, defend such claim, provided that (i) we forthwith make payment to you of the entire amount so claimed and (ii) you may in your sole discretion retain the exclusive right to defend against any such claim with respect to a Client Risk Receivable. We hereby indemnify and hold you harmless from any loss or expense arising out of the assertion of any such claim against you with respect to a Client Risk Receivable or our risk portion of any split-risk Receivable (where we share the credit risk of such customer's financial inability to pay such Receivable when due). The provisions of this Section shall survive and continue in effect notwithstanding the termination of this Agreement.

4. PURCHASE PRICE:

(a) The purchase price you shall pay to us for each Receivable shall equal the Net Invoice Amount thereof less your factoring commission, as specified below. As used herein, the term "Net Invoice Amount" means the gross invoice amount of the Receivable, less returns (whenever made), all selling discounts (at your option calculated on shortest terms) made available or extended to our customer, whether taken or not, and credits or deductions of any kind allowed or granted to or taken by the customer at any time. Unless specifically shown on the invoice sold and assigned to you, no discount, credit, allowance, or deduction with respect to any Receivable shall be granted, or approved, by us to any customer without your prior written consent.

(b) The purchase price (as computed above), less (i) any reasonable reserves or credit balance that you, in your sole discretion, determine to hold, (ii) moneys remitted, paid, or otherwise advanced by you to us or for our account (including any amounts which you may be obligated to pay in the future), and (iii) any other charges to our account provided for by this Agreement, shall be payable by you to us on the date of receipt thereof by you plus (3) business days (a day on which you are open for business exclusive of weekends and legal holidays) for clearing.

(c) You shall be entitled to withhold a reserve of sums otherwise due us, and may revise the amount of such reserve at any time and from time to time if you deem it necessary to do so in order to protect your interests. Furthermore, at your request, we shall maintain a credit balance ("credit balance" or "reserve" shall be defined for purposes of this subparagraph 4(c) as credit for amounts due us and not a "cash balance") with you in such amount as you determine to be commensurate with the

volume and character of the business conducted by us and sufficient to protect you against all possible returns, claims of our customers, indebtedness owing by us to you, or any other contingencies. We shall pay you any debit balance in our account on demand.

(d) In your sole discretion, in accordance with the terms of this Agreement, you may from time to time advance (hereinafter referred to "Advance" or "Advances") to us, against the purchase price of Receivables purchased by you hereunder, sums up to eighty five percent (85%) of the aggregate purchase price of Receivables outstanding at the time any such advance is made, less: (1) Any such Receivables that are in dispute; and (2) Any fees, actual or estimated, that are chargeable to our reserve account. Unless otherwise specified in any promissory note, or loan or other agreement, executed in connection with such Advance, any such Advance shall be payable on demand and shall bear interest at the rate set forth in subparagraph (e) below from the date such Advance is made until the date you would otherwise be obligated hereunder to pay the purchase price of the Receivable(s) against which such advance was made.

(e) Interest upon the daily net balance of any moneys remitted, paid, advanced or otherwise charged to us or for our account before the payment date (including any advance made pursuant to subparagraph 4(d) above), and interest applicable to the charges or to the expenses referred to in this Agreement, shall be charged to our reserve account as of the last day of each month at a rate the greater of six percent (6%) per annum or two percent (2%) above the Prime Rate. The Prime Rate shall mean, at any time, the rate of interest quoted in the Wall Street Journal, Money Rates Section as the "Prime Rate" (currently defined as the base rate on corporate loans posted by at least 75% of the nation's thirty (30) largest banks. In the event that the Wall Street Journal quotes more than one rate, or a range of rates as the Prime Rate, then the Prime Rate shall mean the highest of the quoted rates. In the event that the Wall Street Journal ceases to publish a Prime Rate, then the Prime Rate shall be the average of the three largest U.S. money center commercial banks, as determined by CAPITAL BUSINESS CREDIT LLC In the event that any Advances made by you to us during the term of this Agreement pursuant to subparagraph 4(d) above exceeds eighty five percent (85%) of the aggregate purchase price of all of our Receivables outstanding (and sold and assigned to you) at the time such Advance is made including inventory and equipment availability less any such Receivables that are in dispute and any fees, actual or estimated that are chargeable to our reserve account (any such Advance to be hereinafter referred to as an "Overadvance") then, in such event and until the Overadvance has been duly paid to you, an additional three percent (3%) per annum interest charge shall be assessed and charged to us upon daily balance of any such Overadvance. If, during any month our reserve account or credit balance, subject to the terms and conditions of this Agreement, shall be in a net credit balance (i.e., the reserve or credit balance exceeds outstanding Receivables), then you agree to credit our reserve account as of the last day of each month with interest at a rate equal to three percent (3%) below the Prime Rate. All such interest, whether charged or credited to our reserve account, shall be computed for the actual number of days elapsed on the basis of a year consisting of 360 days. Any adjustment in your interest rate, whether downward or upward, will become effective on the first day of the month following the month in which the prime rate of interest is reduced or increased. In the event that you should declare a breach or default of this Agreement pursuant to paragraph 10 of this Agreement, interest upon the daily net balance of any monies remitted, paid, advanced or otherwise charged to us for our account before the payment date (including any advance made pursuant to subparagraph d above), and interest applicable to the charges or to the expenses referred to in this Agreement, shall upon the date of such breach or default, be charged to our reserve account at the rate of three percent (3%) above the Interest Rate (the "Default Rate") until any and all Obligations due you have been paid in full. HOWEVER, in no event shall the rate of interest agreed to or charged to us hereunder exceed the maximum rate of interest permitted to be agreed to or charged to us under applicable law. IT IS THE INTENTION OF THE PARTIES HERETO NOT TO

MAKE ANY AGREEMENT VIOLATIVE OF THE LAWS OF THE STATE OF NEW YORK OR THE UNITED STATES RELATING TO USURY. IN NO EVENT, THEREFORE, SHALL ANY INTEREST DUE HEREUNDER BE AT A RATE IN EXCESS OF THE HIGHEST LAWFUL RATE, i.e., IN NO EVENT SHALL YOU CHARGE OR SHALL WE BE REQUIRED TO PAY ANY INTEREST THAT, TOGETHER WITH ANY OTHER CHARGES HEREUNDER THAT MAY BE DEEMED TO BE IN THE NATURE OF INTEREST, HOWEVER COMPUTED, EXCEEDS THE MAXIMUM LAWFUL RATE OF INTEREST ALLOWABLE UNDER THE LAWS OF THE STATE OF NEW YORK AND/OR OF THE UNITED STATES. SHOULD ANY PROVISION OF THIS AGREEMENT OR ANY OTHER AGREEMENT BETWEEN US BE CONSTRUED TO REQUIRE THE PAYMENT OF INTEREST THAT EXCEEDS SUCH MAXIMUM LAWFUL RATE, ANY SUCH EXCESS SHALL BE AND IS EXPRESSLY HEREBY WAIVED BY YOU. SHOULD ANY EXCESS INTEREST IN FACT BE PAID, SUCH EXCESS SHALL BE DEEMED TO BE A PAYMENT OF THE PRINCIPAL AMOUNT OF OUTSTANDING INDEBTEDNESS OWING BY US TO YOU AND SHALL BE APPLIED TO SUCH PRINCIPAL.

5. FACTORING COMMISSIONS.

(a) For your services hereunder, we shall pay and you shall be entitled to receive a factoring commission equal to sixty-five hundredths of one percent (.65%) of the gross invoice amount of each Receivable, which commission shall be due and payable to you on the date such Receivable arises. Factoring commissions shall be chargeable to our account with you. You shall be entitled to receive a surcharge equal to one percent (1%) of the gross invoice amount of all Receivables arising out of our sales to Debtors-in-Possession. The minimum factoring commission on each invoice or credit memo shall be $2 or shall be waived subject to electronic transmission of invoices.

(b) Your commission, specified in paragraph 5(a) above, is based upon our maximum selling terms of sixty (60) days, and no more extended terms or additional dating will be granted by us to any customer without your prior written approval. If and when such extended terms or additional dating are given to our customers, your commission with respect to the Receivables represented thereby shall be increased by twenty-five hundredths of one percent (0.25%) for each 30 days, or portion thereof, of extended or additional dating.

(c) The minimum aggregate factoring commissions payable under this Agreement for the first contract year hereof shall be forty thousand dollars ($40,000) payable at ten thousand dollars ($10,000) per three months and for the second contract year hereof shall be sixty thousand dollars ($60,000) payable at fifteen thousand dollars ($15,000) per three months. To the extent of any deficiency (after giving effect to commissions payable under the foregoing subparagraphs), the difference between the minimum and the amount already charged shall be chargeable to our account with you.

6. STATEMENT OF ACCOUNT: Once each month you shall render a statement (Client Ledger) to us with respect to the Receivables purchased by you during the previous month, any advances made by you, collections received by you, and charges made to our account under this Agreement. Our account shall be charged with all discounts (at your option, calculated on shortest terms) made available to customers on assigned Receivables, all returns, allowances, deductions and credits, and your expenses, including, without limitation, postage on invoices, bank wire fees, filing fees, UCC search and similar charges and those costs and expenses as referenced in paragraph 8 of this Agreement. We will also be charged with interest at the rate specified in paragraph 4(e) above, with respect both to Receivables as to which a credit is issued after the payment date applicable thereto, and any Receivables collected or charged back after such credit, or to the date of collection or chargeback, as the case may be. A discount, credit or allowance after issuance or granting may be

or take; (e) costs of appraisals, inspections and verifications of our books and records, and our assets that are subject to the terms of this Agreement, including travel, lodging, and other out-of-pocket expenses for inspections of same (and our operations) by you or your agent(s); (f) costs and expenses of forwarding advances and collections pursuant to this Agreement, collecting checks and other items of payment related to Receivables, and, if applicable, establishing and maintaining payment accounts and lock boxes; and (g) costs and expenses (including attorneys' and paralegals' fees and disbursements) paid or incurred to obtain payment of the Obligations, enforce your security interests and liens, sell or otherwise realize upon the assets which serve as your collateral for our Obligations, and otherwise enforce the provisions of this Agreement and any amendment, supplement, modification, extension, restatement of the Agreement (and any other agreement, document and note relating hereto), or to defend any claims made against you arising out of the transactions contemplated herein (including, without limitation, preparations for and consultations concerning any such matters). Furthermore, we agree to pay your fees for: (i) usage of your on-line computer and electronic data transmission services; (ii) any special or additional reports or statements prepared by you for us; (iii) certain financial accommodations requested by us and extended by you; and (iv) wire transfer fees. We agree and acknowledge that you may change your fees from time to time upon notice to us; however, any failure to give us such notice does not constitute a breach of this Agreement and does not impair your ability to institute any such change(s). The foregoing shall not limit any other provisions of this Agreement regarding costs and expenses to be paid by us. You are hereby irrevocably authorized to charge any amounts payable hereunder directly to any of the account(s) maintained by you with respect to us.

9. SECURITY: As collateral security for any and all of our (and our parent's, subsidiaries' and affiliates') indebtedness and obligations to you (and to your parent, subsidiaries and affiliates), whether matured or unmatured, absolute or contingent, now existing or hereafter arising (including under indemnity or reimbursement agreements or by subrogation), and however acquired by you, whether arising directly between us or acquired by you by assignment, whether relating to this Agreement or independent hereof, including all obligations incurred by us to any other person factored or financed by you (collectively, the "Obligations"), we do hereby grant to you a security interest in all of our accounts, contract rights, computer software, programs, stored data, aging schedules, customer lists, and general intangibles (including all patents, trademarks, and copyrights registered in the United States Copyright or Patent offices, together with the goodwill of the business in connection with which such trademark may be used and the royalties and other fees which become due for the use of such patents, trademarks, or copyrights), whether or not otherwise specifically assigned to you in this Agreement, now existing or hereafter acquired, and in the proceeds and products thereof, any security and guarantees therefor, in the goods and property represented thereby, in all of our books and records relating to the forgoing, and in all reserves, credit balances, sums of money at any time to our credit with you, and any of our property at any time in your possession. In addition to Receivables and all proceeds thereof, we also assign to you all right, title and interest, and grant to you a security interest in, the following collateral to secure all of our present and future obligations and indebtedness to you: (1) all deposit, savings, passbook or like accounts maintained at any bank, savings and loan or similar institution; and (2) the proceeds of any tax refund due to us by the state or federal government. We hereby irrevocably authorize and direct you to charge at any time to our account any Obligations, and to pay any Obligations owing by us to your parent, subsidiaries or affiliates, by so charging our account. We agree to execute financing statements and any and all other instruments and documents that may now or hereafter be provided for by the Uniform Commercial Code or other law applicable thereto reflecting security interests granted to you hereunder. We hereby appoint you as our attorney-in-fact and authorize you to sign such financing statements on our behalf as debtor or to file such financing statements without our signature, signed only by you as secured party. We shall be liable for, and you may charge our account with, all reasonable costs and expenses of filing such financing statements

(including any filing or recording taxes), making lien searches, and any attorney's fees and expenses that may be incurred by you in perfecting, protecting, preserving, or enforcing your security interests and rights hereunder.

10. TERM: This Agreement shall continue in full force and effect for a period of two years from the date hereof and shall be deemed renewed from year to year thereafter unless we give you notice in writing, by registered or certified mail, not less than thirty (30) and not more than sixty (60) days prior to the expiration of the original term of this Agreement (or any renewal term thereof), of our intention to terminate this Agreement as of the end of such term. You may terminate this Agreement at any time upon thirty (30) days' prior written notice to us. Notwithstanding the foregoing, if we become insolvent or unable to meet our debts as they mature, fail, close, suspend, or go out of business, commit an act of bankruptcy, file or become the subject of a petition under the Bankruptcy Act or law permitting the appointment of a receiver, liquidator, conservator, or similar functionary, breach or become in default of any of our representations or warranties to you or any term or provision of this Agreement or any other agreement with you (or your parent, subsidiaries or affiliates), or any Obligation to you, or if there is a change (by death or otherwise) in our principal stockholders or owners, or in the event that any guarantor of our Obligations to you should terminate or revoke their (its) guaranty of our Obligations for any reason whatsoever (any such occurrence of any of the foregoing events shall constitute an event of default under this Agreement) then, notwithstanding the foregoing, you shall have the right to terminate this Agreement at any time without notice. In the event you elect to terminate this Agreement, and your decision to do so is a result of a breach or default of this Agreement by us, then, notwithstanding any other provisions contained herein, you shall be entitled to charge our account, and we agree to pay to you, the monthly minimum factoring fee specified in paragraph 5(c) herein for the later of ninety (90) days from the effective date of termination or until any and all of our indebtedness to you pursuant to this Agreement shall have been paid in full. Your rights and our Obligations arising out of transactions having their inception prior to the termination date shall not be affected by any termination or notice thereof. Termination of this Agreement shall not terminate, extinguish, or remove any liens or security interests granted to you hereunder until we have fully paid and discharged any and all of our Obligations to you, and we shall continue to furnish to you confirmatory assignments and schedules of Receivables previously assigned to you and all proceeds in respect thereof. After the giving of any notice of termination hereunder, and until the full liquidation of our account, we shall not be entitled to receive any payments from you. From and after the effective date of termination, all amounts charged or chargeable to our account hereunder, and all our Obligations to you, shall become immediately due and payable without further notice or demand.

11. MISCELLANEOUS:

(a) Any goods rejected or returned by any customer shall be your property held by us in trust for you separate and apart from any other goods, and, upon your demand and in accordance with your instructions, shall forthwith be delivered to you or disposed of by us without charge to you, with the proceeds of such disposition to be remitted promptly to you. We shall promptly report to you, in writing, all disputes and claims made by our customers, the refusal of any services, and the rejection or return of or offer to return any goods, and we will promptly and diligently prosecute, defend or settle all such claims and disputes at our expense. WE AGREE TO PREPARE AND ASSIGN TO YOU ALL CREDIT MEMOS TO WHICH OUR CUSTOMERS HAVE BECOME ENTITLED SINCE THE DATE OF OUR LAST ASSIGNMENT, and our failure to do so entitles you to charge our account with any expenses incurred by you as a result. As absolute owner of each Receivable, you may, in your sole discretion, enforce, effect any compromise regarding settlement, or adjust any Receivable, in your name or ours, without affecting or limiting our obligations to you under this Agreement, whether or not any such Receivable shall have been charged back to us. You reserve the right at any time to charge back to

(g)  This Agreement is deemed made in the State of New York and shall be governed, interpreted, and construed in accordance with the laws of the State of New York. No modification, amendment, waiver, or discharge of this Agreement shall be binding upon you unless in writing and signed by you. TRIAL BY JURY IS HEREBY WAIVED by us in any action, proceeding or counterclaim brought by either of us against the other on any matters whatsoever arising out of or in any way connected with this Agreement, or the relations created hereby, whether for contract, tort, or otherwise, and we hereby consent to the jurisdiction of the courts of the State of New York and of any Federal Court in such state for determination of any dispute as to any such matters. In connection therewith, we hereby waive personal service of any summons, complaint, or other process, and agree that service thereof may be made by registered or certified mail directed to us at our address set forth above or such other address of which we shall have previously notified you by registered or certified mail. In the event that you obtain counsel for the purpose of collecting any indebtedness due you from us or seeking to enforce any right you are entitled to under the factoring agreement, we agree to pay the reasonable attorneys' fees and expenses (including all such fees incurred at trial and the appellate levels) of your counsel. In addition, in the event you are sued by us or any other party for any claim or cause of action related to or arising under this Agreement or the factoring relationship, or you are required to defend any suit regarding any duty you are alleged to have breached, whether in the form of a contract duty, tort or otherwise, we agree that if you prevail at trial or on appeal we shall be obligated to reimburse you for all of the reasonable attorneys' fees you incur. We also agree that you may charge and/or set off against our account all such fees and expenses as such fees or expenses are incurred. Your books and records shall be admissible as prima facie evidence of the status of the accounts between us. This Agreement shall be binding upon and inure to the benefit of each of us and our respective heirs, executors, administrators, successors and assigns, but we may not assign this Agreement or any of our rights hereunder to any person without your prior written consent.

(h)  We agree and acknowledge that you and your authorized representatives are engaged in the provision of factoring services pursuant to this Agreement. By entering into this Agreement, we expressly acknowledge that we will not seek advice or counsel from you or any of your representatives with respect to the management and/or operation of our business, or any other entity affiliated or controlled by us, and if we deem such advice or counsel to have been offered, directly or indirectly, we will evaluate it and act or decline to act upon it based upon our own careful analysis and/or the advice or counsel of our own independent expert(s) or consultant(s). WE AGREE THAT WE WILL NOT SEEK OR ATTEMPT TO ESTABLISH A FIDUCIARY RELATIONSHIP BETWEEN YOU AND/OR YOUR REPRESENTATIVES AND OURSELVES, OR ANY OTHER ENTITY AFFILIATED OR CONTROLLED BY US. WE HEREBY EXPRESSLY WAIVE ANY RIGHT TO ASSERT, NOW OR IN THE FUTURE, THAT THERE WAS OR IS A FIDUCIARY RELATIONSHIP BETWEEN US IN ANY ACTION, PROCEEDING OR CLAIM FOR DAMAGES.

TURNKEY PRODUCTS, LLC

By: _____

Ken Levi, President

Accepted at New York, New York this __6__ day of __January__ 2014

CAPITAL BUSINESS CREDIT LLC

By: _____

Name: Andrew Tananbaum

Title: Executive Chairman

## EXHIBIT A

Summary of Costs and Expenses Outlined in Paragraph 8 of this Factoring Agreement:

1. Attorneys' and Paralegals' Fees.
   Outside Counsel:    Actual fees and costs incurred.
   In-house Counsel:    $250.00 per hour or as otherwise agreed to in writing by an authorized officer of CAPITAL BUSINESS CREDIT LLC for document preparation and negotiation.

2. UCC Filing Fees:    Actual fees incurred.

3. Costs of Audits and/or Field
   Examinations:    $850 per day for auditor plus actual out-of-pocket expenses for transportation, lodging and meals.

4. Usage of On-Line Computer and
   Electronic Data Transmission
   Services:    As set forth in any Electronic Data Transmission Agreement with CAPITAL BUSINESS CREDIT LLC, which supplements this Factoring Agreement.

5. Additional Reports or Statements: $25.00.

6. Wire Transfer Fees:    Standard wire transfer fees charged to our clients.

7. All other charges:    Actual expenses incurred.

## SECURITY AGREEMENT SUPPLEMENT - INVENTORY

From:        Turnkey Products, LLC
                 723 S. Casino Center Blvd., 2nd Floor
                 Las Vegas, NV 89101

To:           CAPITAL BUSINESS CREDIT LLC
                 11121 Carmel Commons Blvd.
                 Charlotte, North Carolina 28226

Gentlemen:

This is a security agreement supplement to our underlying Factoring Agreement with you executed on the _6_ day of _January_ 2014 as same has been or may hereafter be modified, extended or amended from time to time which is hereby incorporated into said Factoring Agreement (hereinafter sometimes called the "Agreement"), and shall be deemed a part thereof. Each of the terms defined in the Agreement, unless otherwise defined herein, shall have the same meaning when used herein.

        1.    In addition to your other security, we hereby pledge to you and grant you a continuing general lien on and security interest in all Inventory now and hereafter owned by us. The term "Inventory" means and includes all merchandise intended for sale by us and all raw materials, goods in process, finished goods, materials and supplies of every nature used or usable in connection with the manufacture, packing, shipping, advertising or sale of such merchandise. We warrant that all Inventory is and will be owned by us, free of all other liens, security interests and encumbrances, and that we are the owners of the Inventory at wholesale and are not a mercantile establishment selling at retail. All of such Inventory will be kept at our address shown above and in the event of any change in location, we will immediately notify you; but your lien and security interest will be maintained despite the location of the Inventory. We will, at our expense, defend the Inventory against any claims or demands adverse to your interest therein, and will promptly pay, when due, all claims, taxes or assessments levied against us on the Inventory. In the event we fail to pay such claims, taxes and assessments, or fail to keep the Inventory free from any other lien or security interest, you may make expenditures for such purposes and any amount so expended shall be secured hereby and will be repaid with interest on demand at the maximum rate allowable by law.

        2.    Your lien and security interest shall extend and attach to Inventory which is presently in existence and which is owned by us or in which we have an interest, and all Inventory which we purchase or in which we may acquire an interest at any time and from time to time in the future, whether such Inventory is in transit or in our constructive, actual or exclusive occupancy or possession or not, or held by us or others for your account and wherever the same may be located, including, but without limiting the generality of the foregoing, all Inventory which may be located on our premises or upon the premises of any carriers, forwarding agents, truckers, warehousemen, vendors, selling agents, finishers, converters or other third parties who may have possession of the collateral.

        3.    Your lien on the Inventory shall continue through all stages of manufacture and shall, without further act, attach to goods in process, to the finished goods, to the accounts receivable or other proceeds resulting from the sale or other disposition thereof and to all such

5

Inventory as may be returned to us by customers. Forthwith and from time to time hereafter, we shall provide you with one or more separate written statements, dated and signed by us, describing, designating, identifying and evaluating all Inventory now and hereafter owned by us, confirming your lien and security interest. Upon the sale, exchange or other disposition of the Inventory, the security interest and lien created and provided for herein shall without break in continuity and without further formality or act continue in and attach to the instruments for the payment of money, accounts, contract rights, documents of titles, shipping documents, chattel paper and all other cash and non-cash proceeds of such sale, exchange or disposition, including Inventory returned or rejected by customers or repossessed by either of us. As to any such sale, exchange or disposition, you shall have all of the rights of an unpaid seller, including stoppage in transit, replevin and reclamation.

       4.   The Inventory shall be additional security for all obligations to you under the Agreement as originally existing and as hereby and at any time heretofore or hereafter modified, supplemented, amended or extended as well as for all other loans and advances to us or for our account by you, whether now existing or hereafter arising, and for all commissions, obligations, indebtedness, interest charges and expenses chargeable to our account or due from us from time to time, however created and however arising, whether or not evidenced by notes or other instruments, including any and all obligations and indebtedness of any subsidiary or affiliate (including any parent company) of ours, and including officers of such, to you or your subsidiaries and affiliates (including any parent company) all hereinafter called the "Obligations". With respect to all Inventory as well as all accounts, Receivables as defined in the Agreement, and other security, you shall be entitled to all of the rights and remedies set forth in the Agreement.

       5.   Except for sales made in the regular course of our business, we shall not sell, encumber or dispose of or permit the sale, encumbrance or disposal of any Inventory without your prior written consent. As sales are made in the regular course of business, we shall, in accordance with the provisions of the Agreement, immediately execute and deliver to you schedules and assignments of all Receivables created by us. Any collateral assigned to you under the Agreement or this security agreement supplement shall be additional security for the payment of all sums owing by us to you for loans or advances pursuant to this security agreement supplement. If sales are made for cash, we shall immediately deliver to you the identical checks, cash or other forms of payment which we receive. All payments received by you on account of cash sales of Inventory, as well as on account of Receivables, will be credited to our account in accordance with the provisions of the Agreement.

       6.   If any Inventory remains in the possession or control of any of our agents or processors, we shall notify such agents or processors of your lien, and upon request shall instruct them to hold all such Inventory for your account and subject to your instructions. We agree to maintain books and records pertaining to the Inventory in such detail, form and scope as you shall require, and we agree to notify you promptly of any change in our name, mailing address, principal place of business or location of the Inventory. We will also advise you promptly, in sufficient detail, of any substantial change relating to the type, quantity or quality of the Inventory, or any event which would have a material effect on the value of the Inventory or on the lien and security interest granted to you herein. A physical listing of all Inventory, wherever located, shall be taken by us whenever requested by you, and a copy of each such physical listing shall be supplied to you. You may examine and inspect the Inventory at any time. We will execute and deliver to you from time to time, upon demand, such supplemental agreements or documents relating to Inventory, or instruments of indebtedness, in order that the full intent and purpose of this security agreement supplement may be carried into effect.

7. We warrant and represent that we have not and will not during the period that we are indebted to you for any loans, advances or Obligations, enter into any agreement of any kind, the effect of which will create any prior or superior rights, security interests or liens upon any of our assets in which you have a security interest in favor of any person, firm or corporation.

8. At our own expense, we shall keep the Inventory (whether or not in transit) continuously insured in amounts not less than its full insurable value by a reputable and highly rated insurance company or companies acceptable to you against loss or damage from fire, hazards included within the term "extended coverage", theft and such other risks as you may require, in such form and for such periods as shall be satisfactory to you. Each insurance policy shall provide, that loss and proceeds thereunder shall be payable to you as your interest may appear, and which policy shall provide at least ten (10) days' written notice of cancellation to you. We shall deliver to you on demand all such insurance policies or other evidence of compliance satisfactory to you and we shall renew each policy at our own expense and shall deliver satisfactory evidence thereof to you not less than thirty (30) days before its expiration date. If we fail to do so, you may procure such insurance and the cost of such insurance shall be secured hereby and will be payable to you with interest on demand at the maximum rate allowable by law. You may act as attorney-in-fact for us in obtaining, adjusting, settling and canceling such insurance and endorsing any instruments relating thereto, and in the event of loss or damage to the Inventory, you shall have the option to apply the insurance proceeds to the Obligations (whether or not matured) or to the repair or replacement of the Inventory after receiving proof satisfactory to you of such repair or replacement.

9. If we should default in the payment of any Obligation due to you hereunder or otherwise, or in the performance of any provision of The Agreement (including, without limitation, this security agreement supplement and any other supplements thereto), or if a petition under the Bankruptcy Act is filed by or against us, or action in receivership instituted, or if we make an assignment for benefit of creditors, suspend business or become insolvent, or if an attachment be levied or tax lien be filed against any of the Inventory, or if you deem yourself or your security insecure, then you may declare this security agreement supplement in default and all amounts owing under the Agreement (including, without limitation, this security agreement supplement and any other supplements thereto) and all other Obligations owing by us to you shall, without demand or notice, immediately become due and payable (notwithstanding that the maturity date or dates expressed in any evidence of such indebtedness may be otherwise) and you may foreclose your lien or security interest in the Inventory in any way permitted by law, and shall have, without limitation, the remedies of a secured party under the New York Uniform Commercial Code or any other applicable law. You may thereupon enter our premises without legal process and without incurring liability to us remove the same to such place as you may deem advisable, or you may require us to assemble and make the Inventory available to you at a convenient place, or take and maintain possession on our premises and, with or without having the Inventory at the time or place of sale, you may sell or otherwise dispose of all or any part of the Inventory whether in its then condition or after further preparation or processing, either at public or private sale or at any broker's board, in lots or in bulk, for cash or for credit, at any time or place, in one or more sales, and upon such terms and conditions as you may elect. At any such sale you may be the purchaser. If any Inventory shall require rebuilding, repairing, maintenance, preparation, or is in process or other unfinished state, you shall have the right, at your option, to do such rebuilding, repairing, preparation, processing or completion of manufacturing, for the purpose of putting the Inventory in such salable form as you shall deem appropriate.

- 4 -

IF YOU USE LEGAL PROCESS, CONTRACTUAL OR OTHER REMEDY TO OBTAIN POSSESSION OF THE INVENTORY WE WAIVE ANY RIGHT TO ANY NOTICE OF HEARING AND/OR HEARING TO WHICH WE MIGHT OTHERWISE BE ENTITLED PRIOR TO RECOVERY OF THE INVENTORY.

10.    In the event of any public or other sale of the Inventory, the proceeds from any sale shall first be applied to any costs and expenses in securing possession of the Inventory, storing, repairing and finishing for sale, and to any expenses in connection with the sale. The net proceeds will be applied toward the payment of any and all Obligations to you under the Agreement, this security agreement supplement or any other supplements thereto, and otherwise, including interest, attorney's fees, which we hereby expressly agree to pay in the event of any default hereunder and your referral to an attorney, and all other costs and expenses. Application of the net proceeds as to particular Obligations or as to principal or interest shall be in your absolute discretion. Any deficiency will be paid to you forthwith upon demand and any surplus will be paid to us if we are not indebted to you under any other Obligation. The enumeration of the foregoing rights is not intended to be exhaustive and the exercise of any right shall not preclude the exercise of any other rights, all of which shall be cumulative.

11.    To the extent that any of our Obligations to you are now or hereafter secured by property other than the Inventory or by the guaranty, endorsement or property of any other person, firm or corporation, then you shall have the right to proceed against such other property, guarantor, or endorser upon our default in the payment of any Obligation or in any of the terms, covenants or conditions contained herein, and you shall have the right in your sole discretion to determine which rights, security, liens, security interests or remedies you shall at any time pursue, relinquish, subordinate, modify or take any other action with respect thereto, without in any way modifying or affecting any of them or any of your rights hereunder.

12.    Any notice to us shall be in writing and shall be deemed sufficiently made if delivered personally or if transmitted by postage pre-paid first class mail (airmail if international) or by telegraph or by telex with confirmed answerback, to the respective address appearing on the face of this security agreement supplement for such person (or, if none appears, to any address for such person then registered in your records). Any notice to you shall be directed to the attention of a vice-president or higher ranking officer of yours and shall be made in writing in the foregoing manner and shall be deemed sufficient when received by you at the following address: 11121 Carmel Commons Blvd, Suite 270, Charlotte, North Carolina 28226. Any party may change its address for notice by giving written notice of the change in accordance with this paragraph.

13.    As we are a corporation, partnership or other business entity, we hereby further represent and warrant to you that: (a) we are duly organized, validly existing and in good standing under the laws of the jurisdiction of our creation and are duly qualified or licensed to do business in those jurisdictions where the nature of our business requires us to be so qualified or licensed; (b) we have all requisite power and authority (corporate or otherwise) to conduct our business, to own our properties, to execute and deliver this security agreement supplement, and to perform our obligations under the same; (c) the execution, delivery and performance of this security agreement supplement have been duly authorized by all necessary actions (corporate or otherwise) and do not require the consent or approval of our stockholders (if a corporation) or of any other person whose consent has not been obtained; and (d) the execution, delivery and performance of this security agreement supplement does not and shall not conflict with any

provision of our by-laws or articles of incorporation (if a corporation), partnership agreement (if a partnership) or trust agreement or other document pursuant to which we were created and exist, nor conflict with any other agreement by which we are bound.

14.    The lien, rights and security interest granted to you hereunder are to continue in full force and effect, notwithstanding the termination of the Agreement or the fact that the principal account maintained in our name on your books may from time to time be temporarily in a credit position, until the final payment to you in full of all Obligations and indebtedness due you by us, together with interest thereon, and your delay or omission to exercise any right shall not be deemed a waiver thereof or of any other right, unless such waiver be in writing.  A waiver on one occasion shall not be construed as a bar to or waiver of any other rights or remedies on any future occasion.

15.    This security agreement supplement, which is subject to modification only in writing, is supplementary to and is to be considered as part of the Agreement and shall take effect when dated, accepted and signed in Charlotte, North Carolina by one of your officers. This security agreement supplement shall be interpreted according to the laws of the state of Florida and shall inure to the benefit of and be binding upon the parties hereto, their successors and assigns.

Very truly yours,

TURNKEY PRODUCTS, LLC

By: _____ (Seal)
Ken Levi
Member

STATE OF ___CA___    )
                     ) SS:
COUNTY OF _SAN DIEGO_ )

The foregoing instrument was acknowledged before me this _06_ day of _JANVARY_, 2014 by Ken Levi, as Member of Turnkey Products, LLC, an Nevada limited liability company, on behalf of the company.  He [ ] is personally known to me or [ ] has produced _CA DL # N 8528923_____, as identification.

My Commission Expires: _08-24-2014_

Notary Public, State of _CA_
Print Name: _FRANCIS ANTHONY DERBIN_
Commission Number: _1893568_

[NOTARIAL SEAL]

FRANCIS ANTHONY DERBIN
Commission # 1893568
Notary Public - California
San Diego County
My Comm. Expires Jun 24, 2014

- 6 -

Accepted at Charlotte, North Carolina on the $\underline{8}$ day of $\underline{JANUARY}$, 2014.

By: _____
Print Name: Malcolm Ferguson
Title: Executive Vice President

# UCC FINANCING STATEMENT ADDENDUM

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

**9. NAME OF FIRST DEBTOR (1a or 1b) ON RELATED FINANCING STATEMENT**

| | |
|---|---|
| **9a. ORGANIZATION'S NAME** Turnkey Products, LLC | |

OR

| | | |
|---|---|---|
| **9b. INDIVIDUAL'S LAST NAME** | **FIRST NAME** | **MIDDLE NAME, SUFFIX** |

**10. MISCELLANEOUS:**

(This document was filed electronically.)
**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

**11. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME** - insert only one name (11a or 11b) - do not abbreviate or combine names

| | | | |
|---|---|---|---|
| **11a. ORGANIZATION'S NAME** | | | |

OR

| | | | | |
|---|---|---|---|---|
| **11b. INDIVIDUAL'S LAST NAME** | **FIRST NAME** | **MIDDLE NAME** | | **SUFFIX** |
| **11c. MAILING ADDRESS** | **CITY** | **STATE** | **POSTAL CODE** | **COUNTRY** |

| **11d. SEE INSTRUCTIONS** | **ADD'L INFO RE ORGANIZATION DEBTOR** | **11e. TYPE OF ORGANIZATION** | **11f. JURISDICTION OF ORGANIZATION** | **11g. ORGANIZATIONAL ID #, if any** ☐ NONE |
|---|---|---|---|---|

**12.** ☐ **ADDITIONAL SECURED PARTY'S** or ☐ **ASSIGNOR S/P'S** NAME - insert only one name (12a or 12b)

| | | | |
|---|---|---|---|
| **12a. ORGANIZATION'S NAME** | | | |

OR

| | | | | |
|---|---|---|---|---|
| **12b. INDIVIDUAL'S LAST NAME** | **FIRST NAME** | **MIDDLE NAME** | | **SUFFIX** |
| **12c. MAILING ADDRESS** | **CITY** | **STATE** | **POSTAL CODE** | **COUNTRY** |

**13. This FINANCING STATEMENT covers** ☐ timber to be cut or ☐ as-extracted collateral, or is filed as a ☐ fixture filing.

**14. Description of real estate:**

**16. Additional collateral description:**

products of any of the foregoing, (including without limitation proceeds consisting of accounts receivable, chattel paper and insurance proceeds), whether now owned or hereafter acquired by Debtor and wherever located.

**15. Name and address of a RECORD OWNER of above-described real estate** (if Debtor does not have a record interest):

**17. Check only if applicable and check only one box.**
Debtor is a ☐ Trust or ☐ Trustee acting with respect to property held in trust or ☐ Decedent's Estate

**18. Check only if applicable and check only one box.**
☐ Debtor is a TRANSMITTING UTILITY
☐ Filed in connection with a Manufactured-Home Transaction — effective 30 years
☐ Filed in connection with a Public-Finance Transaction — effective 30 years

FILING OFFICE COPY — UCC FINANCING STATEMENT ADDENDUM (FORM UCC1Ad) (REV. 05/22/02)

CT Lien Solutions
UCC Search Report

The following represents a listing of the documentation you requested through a careful search of effective UCC filings recorded in the Office of the Secretary of State of NV, Secretary of State, licensed from the State of an independent third party and maintained in a computerized form and available through our offices. Variations of the Name and Address of the search key may appear on this report as a result of the search findings and your individual request for the information.

This report reflects record effective through Jan. 07,2014

Because we cannot independently verify the accuracy of the public information maintained by the responsible government agency or other sources of this data, we make no guaranties, representations, or warranties as to the accuracy or completeness of this report. We cannot and do not accept any liability for errors or omissions.

State of NV, Secretary of State UCC Debtor Name Search results performed on the following

Search Key :
        Name = %TURN%PROD%

1       2014000277-6 Original filed on Jan. 06,2014
        expires on Jan. 06,2019

        Orig DB                     TURNKEY PRODUCTS, LLC
                                    723 S. CASINO CENTER BLVD. 2ND FLOOR
                                    LAS VEGAS NV 89101

        SecPty                      CAPITAL BUSINESS CREDIT LLC
                                    11121 CARMEL COMMONS BLVD. SUITE 270
                                    CHARLOTTE NC 28226

[End of Report]

CT Lien Solutions
UCC Search Report

The following represents a listing of the documentation you requested through a careful search of effective UCC filings recorded in the Office of the Secretary of State of  NV, Secretary of State, licensed from the State of an independent third party and maintained in a computerized form and available through our offices. Variations of the Name and Address of the search key may appear on this report as a result of the search findings and your individual request for the information.

This report reflects record effective through  Jan. 07,2014

Because we cannot independently verify the accuracy of the public information maintained by the responsible government agency or other sources of this data, we make no guaranties, representations, or warranties as to the accuracy or completeness of this report. We cannot and do not accept any liability for errors or omissions.

State of  NV, Secretary of State UCC Debtor Name Search results performed on the following

Search Key :
        Name = %TURN%PROD%

| No. | Name | Address | City/State | Zip |
| --- | --- | --- | --- | --- |
| * 1 | TURNKEY PRODUCTS, LLC | 723 S. CASINO CENTER BLVD. 2ND FLOOR | LAS VEGAS NV | 89101 |

[End of Report]